SHEPHERD & FINKELMAN, LLC
JAMES C. SHAH
Washington Professional Campus
900 Route 168, Suite B4
Turnersville, NJ 08012
858/232-7900
856/232-7502 (fax)

SCOTT & SCOTT, LLC
DAVID R. SCOTT
JAMES E. MILLER
108 Norwich Avenue
Colchester, CT 06415
Telephone: 860/537-3818
860/537-4432 (fax)

Attorneys for Plaintiff



FILED

SEP 2 4 2002

AT 8:30 .............. M
WILLIAM T. WALSH
CLERK

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

02cv 4665 (WHW)

| | |
|---|---|
| JOSEPH T. CHABAK, on Behalf of Nominal Defendant KNIGHT TRADING GROUP, INC., | ) CIVIL ACTION NO. |
| Plaintiff, | ) COMPLAINT FOR: |
| vs. | ) 1. BREACH OF FIDUCIARY DUTY; ) 2. CORPORATE WASTE |
| ANTHONY M. SANFILIPPO, CHARLES V. DOHERTY, ROBERT GREIFELD, GARY R. GIFFITH, BRUCE R. MCMAKEN, RODGER O. RINEY, PETER S. HAJAS, ROBERT M. LAZAROWITZ, WALTER F. RAQUET and KENNETH D. PASTERNAK, | ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| - and - | ) |
| KNIGHT TRADING GROUP, INC., | ) |
| Nominal Defendant. | ) JURY TRIAL DEMANDED ) |

## SUMMARY OF ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of Nominal Defendant Knight Trading Group, Inc. ("Knight" or the "Company"), against Knight's board of directors and several of its top present and former officers, for breach of fiduciary duty, waste and other unlawful acts, during the relevant period between Feb. 2000 and June 2002, inclusive, in connection with defendants' knowing and/or reckless gross mismanagement of the Company and their ratification and/or complicity in the illegal conduct complaint of herein.

2.      The relevant period begins in late - Feb 2000. On that date, defendants caused Knight to issue a release announcing the Company's success at achieving record single-day trading volume of over 877,000 trades – accounting for more than 12% of Nasdaq's total daily trading volume. In addition to this remarkable feat, defendants also caused the Company to announce that Knight had executed cumulative transactional volume of over 810 million shares in both Over the Counter ("OTC") and Nasdaq trades in the single day, and over 81 billion shares during the full year 1999.

3.      Unbeknownst to investors, however, at the time defendants caused the Company to issue the Feb 2000 release, Company brokers were engaged in the illegal practice of "front-running" client orders, as explained in detail herein, *infra*, such that these brokers were compromising Knight's customers and such that it would be impossible to sustain this level of trading volume. Moreover, as a result of the Knight Brokers' illegal front-running practices, defendants' repeated representations that Knight was able to provide its customers with immediate trade executions, fairly and in an efficient market, which Knight often maintained and managed, were false. The true but undisclosed fact was that, Company traders were permitted to routinely delay customer trades for their own benefit, and, as a result, the customers often paid an artificially inflated price for stocks when the trades were finally executed - - which acted to reduce Knight customers' profits, liquidity and trading confidence.

4.      Thus, what investors did not know was that, during the relevant period, defendants had allowed, and/or were reckless or negligent in not prohibiting Company traders from engaging in an elaborate system of trading-rule violations known as "front-running." By engaging in the practice of front-running, Company brokers were able to reap huge profits; by delaying customer

- 1 -

orders long enough to allow Company traders to make trades in their own accounts or in accounts which they controlled. By doing this, Company traders were able to profit through the usurpation of critical Knight customer information - - the information regarding Knight customers own trades. By purchasing the securities *before* Knight customers' orders increased the level of demand for such security, and before the price was driven higher, for example, and then selling their shares once the price was driven higher by the final execution of Knight customers' trades, Company traders provided themselves a windfall of illegal profits that rightfully belonged to the Knight's customers.

5.      This illegal practice allowed Company brokers to siphon off the profits that resulted directly from the increased demand created by Knight's customer's orders. If a customer was placing a large enough order, or if enough orders were delayed, defendants could virtually guarantee that the increase in demand would drive up the price of a given security, when Knight brokers eventually executed these orders. By initiating a position prior to the execution of these orders, Company traders could guarantee themselves an illegal profit. In addition, when customer orders finally were executed, the stock prices at which their trades were executed were – as a result of the increased market demand created by defendants' front-running – more expensive for Company customers.

6.      Defendants, the members of the Board of the Company, as well as Knight's former Chairman and CEO, defendant Pasternak, who abandoned the Company only weeks before the Board announced that Knight had agreed to pay over $1.5 million in fines and penalties to settle an NASD action against Knight, were aware of the true nature of Knight's brokers' illegal trading scheme, but failed to stop, correct or rectify the illegal conduct complained of herein, or to prosecute those individuals directly involved in this conspiracy and common course of conduct. Instead of taking the actions necessary to stop and correct this action, and to prosecute those individuals responsible for this practice, this scheme was concealed so as to allow defendants to artificially inflate the Company's share prices.

7.      It was only, on or about June 3, 2002, that investors learned the truth about these illegal practices and this fraudulent scheme carried on inside the Company, when it was publicly reported that both the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") were investigating Knight's trading practices, and their effect on

- 2 -

customer executions. Immediately after this sudden and shocking disclosure, the following day, as the news of this investigation was disseminated and as investors realized that defendants had been causing and/or allowing Knight to abuse its customers, shares of Knight plummeted over 28% in the single trading day.

8.     As a result of defendants illegal and improper conduct, and as a result of their participating in, and or willingness to ratify the illegal conduct alleged herein, defendants have caused significant and material damage to Knight.  In addition to causing a crisis of confidence which had a direct and immediate impact on the Company's earnings and revenues, Knight has now been named in a series of class action law suits, now consolidated into a major class action, brought under the Securities Exchange Act of 1934.  Those actions, which allege fraud in connection with the purchase and sale of securities, will cost the Company millions of dollars to defend and tens or hundreds of millions of dollars more to settle or satisfy.

9.     In addition, while Knight's stock traded over $60.00 per share during the relevant period, on Mar. 27, 2000,  following defendants' belated disclosure that, as a result of Company brokers illegal order flow processing and execution in connection with front-running customer orders, which had caused the Company to become the subject of independent SEC and NASD investigations, shares of the Company stock traded as low as $3.90 per share - - a decline of over 93.5% from the relevant period high.  Absent judicial intervention, defendants will not take the action requested herein, and in the continued breach of their fiduciary duties they will proceed to allow the wrongdoers who have profited substantially as a result of their misdeeds to escape justice.

## JURISDICTION AND VENUE

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a). Many of the acts and conduct constituting the violations of law complained of herein occurred in this District.  In addition, Knight maintains its principal executive offices in this District.

11.     The foregoing contacts are sufficient to justify the exercise of personal jurisdiction over all the individual defendants by New Jersey courts, because one or more of the defendants either resides or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts

- 3 -

detailed herein and aiding and abetting and conspiracy in violation of the fiduciary duties owed to Knight occurred in this District, and defendants have received substantial compensation in this District by doing business here and by engaging in numerous activities which had an effect in this District.

12.     This District has jurisdiction over this action pursuant to 28 U.S.C. §1332 (a)(1) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. Nominal defendant Knight's principal executive offices are located in Jersey City, New Jersey, and all defendants and plaintiff in this litigation are citizens of different states.

## PARTIES

13.     Plaintiff Joseph T. Chabak is, and at all times relevant hereto was, a shareholder of Knight. Plaintiff Chabak is a resident of the state of Florida.

14.     Nominal party Knight is a Delaware corporation with its principal place of business located in Jersey City, New Jersey. According to the Company, Knight is a market-maker in equity securities and options of individual equities in the U.S., Europe and Japan. Knight is a citizen of New Jersey, and its common shares are publicly traded on the Nasdaq National Market Exchange (the "Nasdaq"). As of May 14, 2002, Knight had over 123 million shares of common stock issued and outstanding held by thousands of shareholders.

15.     Defendant **ANTHONY M. SANFILIPPO** ("Sanfilippo") is, and since Feb. 2002 has been, the Interim Chief Executive Officer and a member of the Board of the Company.[1]   In

---

[1]According to the Company's latest Proxy, filed with the SEC in or about Apr. 2002, Knight has thirteen positions on its Board of Directors, of which eleven directors currently serve. According to the Company, John G. Hewitt resigned as a director in July 2001 and his vacancy has not been filled. Peter S. Hajas resigned as a director in Apr. 2002 and his vacancy has not been filled. The Board of Directors has resolved to reduce the size of its Board from thirteen to seven, effective upon the election of the new Board at the Annual Meeting. As a result, at least 4 former members of the Company's Board (Messrs. Pasternak, Raquet, Turner, and Roach) did not stand for re-election. Each of these seven current directors nominated for election this year was elected by the stockholders at the 2001 Annual Meeting of Stockholders. The Board of Directors further intends to recruit three additional members to the Board, of which at least two will be independent directors and one may be the new Chief Executive Officer of the Company if the Company hires externally to fill the position. At such time, the Board will increase its composition to ten directors, subject to approval by the stockholders.

addition, defendant Sanfilippo has been the President and CEO of Knight Capital Markets, and head of global equities for the Company and Chairman of Knight Roundtable Europe, since 1998 and 2001, respectively. Defendant Sanfilippo has served as a director of Knight since the Company's initial public offering. From 1993 to 1997, defendant Sanfilippo was President and CEO of Tradetech Securities, a market maker in the Nasdaq Inter-Market, which he founded in 1993 and which was subsequently acquired by Knight Capital Markets in 1997. Defendant Sanfilippo, along with defendants Doherty, Greifeld and Pasternak were also each members of the Nominating and Corporate Governance Committee, which Committee was and is responsible for making recommendations to the Knight Board on whom to nominate as Directors of the Company, and this Committee also sets Company-wide policy regarding standards of administration and institutes and oversees the Company's system of checks and balances. Defendant Sanfilippo is a citizen of Connecticut.

16.    Defendant **CHARLES V. DOHERTY** ("Doherty") is, and since Feb. 2002 was, non-executive Chairman of the Board, and has served on the Board of Knight since the Company's initial public offering, and before that, as an advisory board member of Roundtable Partners, L.L.C., ("Roundtable Partners") the Company's predecessor, since March 1995. Defendant Doherty along with defendants Griffith and McMaken were and are also members of the Finance and Audit Committee of the Board of Knight, charged with providing assistance to the full Board in fulfilling its oversight responsibilities with respect to monitoring: (1) the quality and integrity of the financial statements; (2) the risk and control environment of the Company; and (3) the independence and performance of the Company's independent auditors. The Finance and Audit Committee also reviews and makes recommendations to the Board regarding: (i) all proposed material new capital formation plans, including planned issuances of equity securities and debt instruments; and (ii) certain material acquisitions, divestments and investments by the Company. Defendant Doherty along with defendants Riney and Lazarowitz are and were also members of the Compensation Committee of the Knight. According to the defendants, the Compensation Committee provides assistance to the Board to ensure that the Company's officers, key executives and directors are compensated in accordance with the Company's total compensation objectives and executive compensation policies,

- 5 -

strategies and pay levels necessary to support organizational objectives. Defendant Doherty, along with defendants Sanfilippo, Greifeld and Pasternak were also each members of the Nominating and Corporate Governance Committee, which Committee is responsible for making recommendations to the Knight Board on whom to nominate as directors of the Company. The Nominating and Corporate Governance Committee also sets Company-wide policy regarding standards of administration and institutes and oversees the Company's system of checks and balances. Defendant Doherty is a citizen of Illinois.

17. Defendant **ROBERT GREIFELD** ("Greifeld") is, and at all times relevant to the allegations raised herein was, a member of the Knight Board having served in this position since 2000. Defendant Greifeld is also Executive Vice President of SunGard Data Systems ("SunGard"). From Feb. 2000 until Feb. 2002, defendant Greifeld was Sr. V.P. at SunGard and prior to that, was VP of SunGard, and from May 1999 to Aug. 1999, he was CEO of SunGard Brokerage Systems Group. From 1993 to 1999, defendant Greifeld was President of Automated Securities Clearance, Ltd., which was acquired by SunGard in March 1999. During 2001, license fees and services rendered to Knight by SunGard Data Systems amounted to approximately $4.5 million. Defendant Greifeld, along with defendants Doherty, Sanfilippo and Pasternak were also each members of the Nominating and Corporate Governance Committee, which Committee is responsible for making recommendations to the Knight Board on whom to nominate as Directors of the Company. The Nominating and Corporate Governance Committee also sets Company-wide policy regarding standards of administration and institutes and oversees the Company's system of checks and balances. Defendant Greifeld is a citizen of New Jersey.

18. Defendant **GARY R. GRIFFITH** ("Griffith") is, and at all times relevant to the allegations raised herein was, a member of the Knight Board having served in this position since the Company's initial public offering and, before that, as an advisory board member of Roundtable Partners since March 1995. Defendant Griffith along with defendants Doherty and McMaken were and are also members of the Finance and Audit Committee of the Board of Knight, charged with providing assistance to the full Board in fulfilling its oversight responsibilities with respect to monitoring: (1) the quality and integrity of the financial statements; (2) the risk and control

- 6 -

environment of the Company; and (3) the independence and performance of the Company's independent auditors. The Finance and Audit Committee also reviews and makes recommendations to the Board regarding: (i) all proposed material new capital formation plans, including planned issuances of equity securities and debt instruments; and (ii) certain material acquisitions, divestments and investments by the Company. Defendant Griffith is a citizen of New York.

19. Defendant **ROBERT M. LAZAROWITZ** ("Lazarowitz") is, and at all times relevant to the allegations raised herein was, Executive V.P. and a member of the Knight Board and COO of Knight Capital Markets, a subsidiary of Knight. Defendant Lazarowitz has served as a director of the Company since May 2001, and before Nov. 2000, defendant Lazarowitz was a director of the Company since its inception. Defendant Lazarowitz was also a co-founder of Roundtable Partners. Before Nov. 2000, defendant Lazarowitz served for 12 years as CFO and then as COO of Knight Capital Markets. Defendant Lazarowitz along with defendants Doherty and Riney are and were members of the Compensation Committee of the Knight Board, having served in this capacity since May 2001. According to the defendants, the Compensation Committee provides assistance to the Board to ensure that the Company's officers, key executives and directors are compensated in accordance with the Company's total compensation objectives and executive compensation policies, strategies and pay levels necessary to support organizational objectives. Defendant Lazarowitz is a citizen of New Jersey.

20. Defendant **BRUCE R. MCMAKEN** ("McMaken") is, and at all times relevant to the allegations raised herein was, a member of the Knight Board having served in this position since Knight's initial public offering and, before that, as an advisory board member of Roundtable Partners, since March 1995. Defendant McMaken along with defendants Doherty and Griffith were and are also members of the Finance and Audit Committee of the Board of Knight, charged with providing assistance to the full Board in fulfilling its oversight responsibilities with respect to monitoring: (1) the quality and integrity of the financial statements; (2) the risk and control environment of the Company; and (3) the independence and performance of the Company's independent auditors. The Finance and Audit Committee also reviews and makes recommendations to the Board regarding: (i) all proposed material new capital formation plans, including planned

issuances of equity securities and debt instruments; and (ii) certain material acquisitions, divestments and investments by the Company. Defendant McMaken is a citizen of Texas.

21.  Defendant **RODGER O. RINEY** ("Riney") is, and at all times relevant to the allegations raised herein was, a member of the Knight Board having served in this position since Knight's initial public offering and, before that, as an advisory board member of Roundtable Partners since March 1995. Defendant Riney along with defendants Doherty and Lazarowitz are and were members of the Compensation Committee of the Knight Board, having served in this capacity since May 2001. According to the defendants, the Compensation Committee provides assistance to the Board to ensure that the Company's officers, key executives and directors are compensated in accordance with the Company's total compensation objectives and executive compensation policies, strategies and pay levels necessary to support organizational objectives. Defendant Riney is a citizen of Missouri.

22.  Defendant **KENNETH D. PASTERNAK** ("Pasternak") was, prior to his sudden and immediate departure from the Company in Feb. 2002, Chairman and Chief Executive Officer of Knight.  While employed as head of the Company defendant Pasternak had a unique compensation package which included the following components: (1) his base salary of $750,000; (2) 35% of profits from his personal trading account in calendar 2001, as provided by his employment agreement (which was limited to $3,000,000 in cash); and (3) his participation in the EIP ($442,000). According to the Company's latest Proxy, defendant Pasternak received compensation in 2001 that was "within the discretion of the Board of Directors or the Compensation Committee." Defendant Pasternak, along with defendants Doherty, Greifeld and Sanfilippo were also each members of the Nominating and Corporate Governance Committee, which Committee is responsible for making recommendations to the Knight Board on whom to nominate as Directors of the Company. The Nominating and Corporate Governance Committee also sets Company-wide policy regarding standards of administration and institutes and oversees the Company's system of checks and balances. Defendant Pasternak is a citizen of New Jersey.

23.  Defendant **PETER S. HAJAS** ("Hajas") was, prior to his sudden and immediate departure from the Company in or about April 2002, the President and Chief Operating Officer of

- 8 -

the Company and was a member of the Knight Board of Directors. Defendant Hajas is a citizen of Minnesota.

24.    Defendant **WALTER F. RAQUET** ("Raquet") was, prior to his sudden and immediate departure from the Company during early 2002, Executive Vice President of the Company and was a member of the Knight Board of Directors. Defendant Raquet is a citizen of New York.

25.    The defendants identified herein in ¶¶ 15-21, *supra*, are the current officer and non-officer directors of the Company, and are referred to collectively herein as the "Director Defendants." In addition, the defendants identified herein in ¶¶ 22-24, *supra*, in combination with the Director Defendants, are referred to collectively as the "Individual Defendants." By reason of their positions and their ability to control the business and corporate affairs of Knight, the Director and Individual Defendants owed Knight and its shareholders fiduciary obligations of fidelity, trust, loyalty, good faith, fair dealing, and due care, and were required to use their utmost ability to control and manage Knight in a fair, just and equitable manner and to act in furtherance of the best interests of Knight and all its shareholders. This obligation includes a duty to conduct the Company's business in a fair and honest manner, and not to abuse the Company, its shareholders or its customers in such a manner that would have a direct and material adverse negative effect on Knight, its financial condition, operations or goodwill.

## DUTIES OF KNIGHT'S DIRECTORS AND OFFICERS

26.    Defendants owed fiduciary duties of good faith and fair dealing to Knight and its public shareholders. To discharge their duties, defendants were required to independently and effectively supervise and regulate Knight's executives and Knight's policies, practices, controls and financial affairs and to:

a.    act in the best interests of Knight and prevent any abuse of control by other top executives in the conduct of the business and affairs of Knight;

b.    govern Knight to utilize its resources in a manner to benefit the Company and its public shareholders and not the personal interests or preferences of defendants;

c.    refrain from abusing their positions of control;

- 9 -

      d.    not favor their own interests at the expense of Knight and/or its public shareholders;

      e.    in good faith oversee, supervise and direct the business and affairs of Knight and its executives in accordance with the applicable laws;

      f.    upon receiving notice of improper conduct to take steps to correct or remedy that conduct;

      g.    exercise reasonable control and supervision over the officers and employees of Knight; and

      h.    to honestly communicate with Knight's shareholders.

Thus, each of the Individual Defendants owed Knight and its public shareholders obligations of candor, fidelity and loyalty, and not to attempt to frustrate or impede the maximization of shareholder value in order to obtain any improper monetary benefit in their capacity as an officer and/or director.

      27.    Purportedly in exchange for their loyalty and fidelity, according to the Company's FY:02 Proxy Statement, defendants Pasternak, Raquet, Sanfilippo and Hajas, then the senior-most officers and/or employee-directors of the Company received very significant compensation packages from Knight during FY:99, 00 and 01, as follows:

| | | Annual Compensation | | Long-Term Compensation | | |
| | | | | Securities Underlying Options | Restricted Stock Awards($) | All Other Compensation |
| Name and Principal | Year | Salary | Bonus | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Kenneth D. Pasternak .......... | 2001 | $750,000 | $ 3,442,000(*) | 59,358 | $197,337 | $31,028 |
| Former Chairman and Chief | 2000 | 250,000 | 26,212,659(*) | -- | -- | 25,113 |
| Executive Officer | 1999 | 250,000 | 19,155,017(*) | -- | -- | 24,244 |
| Walter F. Raquet................. | 2001 | 350,000 | 504,808 | 54,159 | 105,329 | 11,538 |
| Executive Vice President | 2000 | 250,000 | 7,015,836 | -- | -- | 6,476 |
| | 1999 | 250,000 | 6,859,466 | -- | -- | 6,269 |
| Anthony M. Sanfilippo ......... | 2001 | 349,247 | 504,808 | 51,616 | 158,501 | 12,177 |
| Interim Chief Executive Officer | 2000 | 250,000 | 1,955,392 | -- | -- | 5,809 |
| | 1999 | 250,000 | 1,200,152 | -- | -- | 5,533 |
| Peter S. Hajas ............... | 2001 | 350,000 | 848,125 | 47,191 | -- | -- |
| Former President and Chief | 2000 | 250,000 | 1,696,578 | -- | -- | -- |
| Operating Officer | 1999 | -- | -- | -- | -- | -- |

- 10 -

(*)  Includes $3,000,000, $10,581,217 and $4,238,732 paid as trading compensation to Pasternak for the years ended Dec. 31, 2001, 2000 and 1999, respectively.

28.     Also, purportedly in exchange for their loyalty and fidelity, Knight's non-employee directors also receive lucrative compensation from the Company to assure their obligations of good faith and candor to Knight and its outside shareholders.  According to the Company's FY:02 Proxy Statement, these non-employee directors received very significant compensation packages from Knight, as follows:

### COMPENSATION OF DIRECTORS

Each of the independent Directors receive an annual fee of *$18,000* and a meeting fee of *$1,000* for each of the Board of Directors and Committee meetings attended, except for the Finance and Audit Committee meetings where attendees receive *$3,000* per meeting. Committee chairpersons receive an additional fee of *$10,000* per year. All Directors are reimbursed for out-of-pocket expenses. Each newly elected independent Director is granted an option to purchase *16,000 shares* of Class A Common Stock. In addition, on the first business day following each annual meeting of our stockholders, each continuing independent Director will be granted an option to purchase *8,000 shares* of Class A Common Stock. For the fiscal year ended December 31, 2001, Directors of the Company who were not officers received the above-described directors' fees from the Company aggregating $350,000.

29.     Each officer and director of Knight owed Knight and its public shareholders the duty to exercise a high degree of due care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Knight's directors complained of herein involves a knowing and culpable violation of their obligations as directors of Knight, the absence of good faith on their part, and a reckless disregard for their duties to the Corporation and its shareholders, which the directors were aware or should have been aware posed a risk of serious injury to the Corporation.  The conduct of Knight's officers and directors who permitted, engaged in or failed to rectify the illegal trade execution scheme and market manipulation of stocks traded by the Company's brokers on behalf of Knight customers, has been ratified by Knight's Board, which has failed to take any action against them.

30.     Each defendant is sued individually in his respective capacity as an officer and/or director of Knight.  The liability of each arises from the fact that each participated in the plan to advance his own personal interests at the expense of Knight and its shareholders.

31.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the misappropriation of critical customer information as part of the Company's brokers' scheme to front-run orders and manipulate the market for securities which they traded, violated the fiduciary duties owed to Knight and its public shareholders, including their duties of loyalty, good faith and independence, insofar as they have allowed this misreporting and have allowed the defendants to misrepresent the financial condition of the Company, both of which ultimately cost the Company and its shareholders **tens of millions of dollars** in the reduction of Knight's market capitalization and equity value, at the expense of and to the detriment to Knight's public shareholders.

32.     Because the Individual Defendants have breached their duties of loyalty, candor and independence in connection with their failure to act in good faith and abide by their obligation to conduct the business and operations of the Company in a fair and truthful manner and not to abuse clients confidence and trust and to manipulate the market for securities which they traded, the Individual Defendants, as a matter of law, have breached their fiduciary duties of good faith and fair dealing owed to Knight, its shareholders and its customers.

## SUBSTANTIVE ALLEGATIONS

33.     The relevant period commences on Feb. 29, 2000, at which time defendants caused Knight to issue a release titled "Knight/Trimark Group Executes Record Trade Volume of 877,071 Trades in Single Day," *which served to highlight defendants' unique abilities and competencies in processing customer orders in a fair and efficient manner*, as follows:

> Knight/Trimark Group, Inc., the largest wholesale market marker in U.S. equity securities, today reported that it executed 877,071 trades on February 24, 2000, representing a cumulative share volume of over 810 million shares in both OTC and listed securities.
>
> The company's share volume accounted for approximately 12 percent of the February 24 reported Nasdaq, New York Stock Exchange and American Stock Exchange share volume. Knight/Trimark executed over 81 billion shares during 1999, a share volume second only to those of Nasdaq and the NYSE.
>
> Knight/Trimark, headquartered in Jersey City, NJ, is the parent company of Knight securities, Trimark Securities and Knight Financial Products (formerly Arbitrade, LLC). Knight is the largest wholesale market maker in U.S. equity securities. The four-year old Knight/Trimark Group, as the largest destination for on-line trade

executions, is the unseen"processing power" behind the explosive growth in on-line securities trading. The firm was recently selected to the Fortune "e-50 Stock Index," an elite collection of companies that are shaping the new Internet based economy. The firm employs more than 800 people worldwide.

34.    Defendants knew or were reckless or negligent in not knowing that the Feb. 29, 2000 release was materially false and misleading for the following reasons:

(a)    that, this release created the materially false and misleading impression that Knight was able to fairy and efficiently manage customers orders and to provide such customers an efficient market in which to trade, when in fact the markets provided by defendants were neither fair nor efficient and were, at all times during the relevant period, manipulated by Knight traders who were actively front-running Knight customers' orders;

(b)    that, the "record" trading volume which defendants announced could not be sustained as a direct result of defendants illegal trading activities. Since Company brokers were actively engaged in reducing the returns on Knight customers' transactions, it was only a matter of time before the impact of this illegal activity would reduce customer liquidity and/or customer confidence in the markets, such that Knight customers would necessarily be forced to trade less than they would otherwise have done; and

(c)    that, the "record" trading volume which defendants announced was artificially inflated, in part, by the front running trades enacted by Knight Brokers themselves - - the more front running the greater the trading volume, the bigger rip-off of customers the higher the brokers' illegal profits.

35.    On Apr. 19, 2000, defendants caused Knight to issued a release which announced financial results for 1Q:00, the period ending Mar. 31, 2000. According to this release, Knights revenues for 1Q:00 were $513.1 million, an increase of 152% compared to revenues of $203.4 million reported in 1Q:99, and pro forma net income totaled $135.6 million, or $1.07 per share on a diluted basis, an increase of 223% compared to $41.9 million, or $0.34 per share on a diluted basis for the same period a year ago. According to defendants, *"The month of March 2000 was the Company's best performing month in its history*, with both record trade volumes and net trading revenues." In addition to the foregoing, defendants used this release to condition investors and

customers to believe that, throughout the relevant period, Knight maintained the ability to make immediate trades and to "trade when our clients want to trade and at the price they specify," as follows:

> Our success in the first quarter 2000 demonstrates that Knight is not reliant on the direction of the market, up or down. Instead, market volume and volatility are the main drivers of our business. The paradigm shift toward the self-directed investor made Knight viable. *Our value proposition is that we trade when our clients want to trade and at the price they specify. We stand apart from other market participants by the fact that we provide clients with immediacy and proactive guaranteed liquidity on their transactions. Our ability to provide retail investors with this level of service has, in turn, made Knight an increasingly attractive execution destination for institutional investors looking to trade their large block orders intelligently and efficiently.*

36.    The statements contained in the Apr. 19, 2000 release, reproduced above in ¶ 35, *supra*, were materially false and misleading and were know by defendants to be false at the time of such publication, or were recklessly or negligently disregarded thereby, for the reasons stated herein.

37.    On July 19, 2000, defendants caused Knight to issue a release announcing results for 2Q:00, the period ended June 30, 2000. According to this release, revenues for 2Q:00 were $313.5 million, an increase of 23% compared to revenues of $254.2 million reported in 2Q:99, and net income for 2Q:00 totaled $67.2 million, or $0.53 per share on a diluted basis, a 16% increase from $58.0 million, or $0.46 per share on a diluted basis for the pro forma period a year ago. In addition to the foregoing, defendant Pasternak commented on the Company's performance as follows:

> *We made significant strides toward growing our client base, expanding our systems capacity and processing power, enhancing our execution standards, and building our business model in international markets*. Indicative of our success during the past quarter is what we accomplished in the options industry. In less than six months since entering the business, we now are a major player in options trading. We have a presence on all five of the major U.S. options exchanges, and can handle options orders in more than 250 companies.
>
> \*   \*   \*
>
> We also were successful in attracting order flow from a more diverse client base during the past quarter. Institutional order flow, for example, accounted for 44% of our equity trading revenues, versus 19% in the second quarter of 1999. We also implemented a new trading service in Nasdaq stocks that enhances our execution capabilities in the OTC market by offering more opportunities for price improvement through executions requiring no dealer intervention. The viability of the Nasdaq InterMarket, in which we are the largest trading firm, was reaffirmed when three electronic communications networks (ECNs) agreed to forge links to that market. *All of these developments indicate that Knight is well positioned to become the*

- 14 -

*liquidity center best equipped to provide superior order executions in OTC and listed securities transactions.*

38.     The statements contained in the July 19, 2000 release, reproduced above in ¶ 37, *supra*, were materially false and misleading and were know by defendants to be false at the time of such publication, or were recklessly or negligently disregarded thereby, for the reasons stated herein.

39.     On Oct. 18, 2000, defendants caused Knight to issue a release which announced results for 3Q:00, the period ended Sept. 30, 2000. According to this release, revenues for 3Q:00 were $199.1 million, an increase of 22% compared to revenues of $163.8 million reported in 3Q:99, and net income for 3Q:00 totaled $20.6 million, or $0.16 per share on a diluted basis, a 27% decrease from $28.2 million, or $0.22 per share on a diluted basis for the pro forma period a year ago. In addition to the foregoing, defendant Pasternak commented on the Company's performance as follows:

> The markets experienced a great deal of uncertainty. This uncertainty was caused by a confluence of factors -- namely the lingering effects of the second quarter market correction, summer seasonality, and investor concern over energy costs, corporate earnings, the weak Euro and the upcoming presidential election. *We believe that this market environment caused self-directed individual investors to take a more conservative approach to investing*, leaving the majority of trading activity to professional traders, program traders and institutions. This market dynamic was accompanied by a rotation in our order flow mix away from growth and technology stocks toward a heavier concentration in large cap issues such as those in the Nasdaq 100 and on the NYSE -- stocks for which Knight posts lower revenue capture per share. All of these factors hurt Knight's profit performance during the third quarter.

40.     The press release included statements made by defendant Pasternak, who noted a variety of complex market factors and interrelationships and their negative effects on Knight's earnings. What defendant Pasternak did not disclose, however, was that the Company's illegal trading practices were having a material adverse impact on Knight's customers. In fact, at this time, as market conditions worsened, the adverse impact which resulted from the prolonged abuse of Knight customers began to take its toll. As profits became leaner, and as customers were continued to be forced to compete with Company brokers on an uneven playing field, it was customer under-capitalization and loss of confidence that was leading to the rapid decline in trading volume. Defendants actions were a material contributing factor which were leading directly to the trading volume declines which defendant Pasternak was now attempting to explain.

41. On Jan. 17, 2001, defendants caused Knight to issue a release which announced results for 4Q:00, the period ended Dec. 31, 2000. According to this release, revenues for 4Q:00 were $251.3 million, a decrease of 11% compared to revenues of $281.7 million reported in 4Q:99, and net income for 4Q:00 totaled $35.3 million, or $0.28 per share on a diluted basis, a 41.5% decrease from $60.3 million, or $0.47 per share on a diluted basis for the pro forma period a year ago. In addition to the foregoing, defendant Pasternak commented on the Company's performance as follows:

> The Nasdaq closed its worst year ever, plunging 33% in the fourth quarter alone, and the New York Stock Exchange ended its worst year since 1981. The year closed out with a modest 6% decline in the Dow Jones Industrial Average versus the massive 39% decline in the Nasdaq Composite Index. Tax loss selling, portfolio repositioning and bargain hunting caused volumes on both exchanges to rebound to record levels in December. Investors, however, continued to seek refuge in larger cap, defensive stock issues as a safe haven from the volatility of technology and Internet stocks.
>
> ***We believe that the market correction kept many self-directed individual investors on the sidelines or in larger cap, defensive stock issues throughout the fourth quarter.*** This mix of stocks -- for which Knight posts lower revenue capture per share -- negatively impacted our revenue for the quarter. ***These pressures were partially overcome by our unique trading methodology and our diverse client base and product offerings, resulting in a solid fourth quarter despite these challenging market conditions.***

42. The release again included explanations offered by defendant Pasternak to explain the decline in Company trading volume, and he again noted a variety of complex market factors and interrelationships and their negative effects on Knight's earnings, which did not include a disclosure that the Company's illegal execution practices were compounding the adverse market conditions and magnifying the material adverse impact on Knight's customers. In fact, at this time, as market conditions worsened, the adverse impact which resulted from the prolonged abuse of Knight customers continued to take its toll. As profits became leaner, and as customers were continued to be forced to compete with Company brokers on an uneven playing field, it was customer under-capitalization and loss of confidence that were leading to the rapid decline in trading volume. Defendants actions were a material contributing factor which was leading directly to the trading volume declines which defendant Pasternak was now attempting to rationalize.

43. On April 18, 2001, defendants caused Knight to issue a release which announced results for 1Q:01, the period ended Mar. 30, 2001. According to this release, revenues for 1Q:01

were $225.6 million, a decrease of 56% compared to revenues of $510.6 million reported in 1Q:00,

and net income for 1Q:01 totaled $26.9 million, or $0.21 per share on a diluted basis, an 80%

decrease from $135.7 million, or $1.07 per share on a diluted basis for the pro forma period a year

ago. In addition to the foregoing, defendant Pasternak commented on the Company's performance

as follows:

> First quarter 2001 was the most challenging trading environment Knight has
> experienced, characterized by severe declines across most of the leading indexes. The
> Nasdaq, DJIA, S&P 500 and Russell 2000 indices closed down 26%, 8%, 12% and
> 7%, respectively, during the quarter, despite increased trading volume. The
> precipitous decline in the Nasdaq Composite Index, which went from a high of 5,049
> on March 10, 2000 to its first quarter 2001 low of 1,820 on March 29th, negatively
> impacted trading activity by the self-directed investor -- Knight's core constituency.
> *Record levels of money flows into money market funds during the first two months
> of this year reflected the bias in self-directed investor sentiment towards cash
> rather than equities. Absent any economic catalyst, we believe the self-directed
> investor will continue to remain cautious as the market cycle bottoms out.*
>
> *Knight's efforts to diversify our revenue stream through enhanced product
> offerings and by broadening our client base have been important factors in
> partially offsetting the negative effects of the current market.* Despite the recent
> cyclical downturn in the equity markets, we believe there is a powerful, ongoing
> secular trend towards self-directed investing as a means of wealth creation and
> management. Evidence of this trend is clearly outlined when one reviews Knight's
> average daily equity trades for the first quarters of the past five years: 63,000 in 1997,
> 124,000 in 1998, 306,000 in 1999, 700,000 in 2000, and 487,000 in 2001. We
> believe that positioning Knight as a single point of entry for order flow across
> multiple product, client and geographic lines will enhance our ability to capture the
> benefits of this trend when the market cycle swings back into positive territory.

44.     The statements contained in the Apr. 18, 2001 release, reproduced above in ¶ 43,

*supra*, were materially false and misleading and were know by defendants to be false at the time of

such publication, or were recklessly or negligently disregarded thereby, for the reasons stated herein.

45.     On July 18, 2001, defendants caused Knight to issue a release which announced

results for 2Q:01, the period ended June 30, 2001. According to this release, revenues for 2Q:01

were $165.8 million, a decrease of 46% compared to revenues of $307.1 million reported in 2Q:00,

and net income for 2Q:01 totaled $3.8 million, or $0.03 per share on a diluted basis, an 94% decrease

from $67.5 million, or $0.53 per share on a diluted basis for the pro forma period a year ago. In

addition to the foregoing, defendant Pasternak commented on the Company's performance as

follows:

"Knight was fully prepared from a systems and client product position for the impact of decimalization. This regulatory change was fully implemented on April 9th for all Nasdaq securities," stated Kenneth D. Pasternak, Chairman and Chief Executive Officer of Knight Trading Group. "We knew the operating environment would be challenging under decimalization. However, we could not foresee the full magnitude of a concurrent, but separate, rule -- the implementation of a one-penny minimum price variant (MPV), which allowed for trading in increments as small as one cent."

\*   \*   \*

Knight is the liquidity center that offers superior execution services to its broker-dealer and institutional clients in over-the-counter (OTC) and listed equity securities, and in equity options. In so doing, Knight helps its clients meet their fiduciary obligation of obtaining best execution for the securities orders that they place on behalf of their customers. Knight also maintains an asset management business for institutional investors and high net worth individuals through Deephaven Capital Management.

46.     The statements contained in the July 18, 2001 release, reproduced above in ¶ 45, *supra*, were materially false and misleading and were know by defendants to be false at the time of such publication, or were recklessly or negligently disregarded thereby, for the reasons stated herein.

47.     On Oct. 17, 2001, defendants caused Knight to issue a release which announced results for 3Q:01, the period ended Sept. 31, 2001. According to this release, revenues for 3Q:01 were $130.9 million, a decrease of 30% compared to revenues of $187.9 million reported in 3Q:00, and net income for 3Q:01 totaled $5.7 million, or a loss of $0.05 per share on a diluted basis, a 128% decrease from $20.6 million, or $0.16 per share on a diluted basis for the pro forma period a year ago. In addition to the foregoing, defendant Pasternak commented on the Company's performance, including the effects the Sept. 11. Tragedy, as follows:

"Knight's first quarterly loss since its founding occurred during an unprecedented three months in both financial and American history," said Kenneth D. Pasternak, Chairman & Chief Executive Officer of Knight Trading Group. "First, a cyclical low in the equity markets was compounded by the traditional third-quarter seasonal low. Second, market participants were -- and are still -- adjusting to the major market structure issues brought about by the introduction of decimalization and the one-penny Minimum Price Variant in April 2001. And finally, the effects of the September 11th attacks were two-fold: they resulted in the four-day closure of the market, and a consequential dramatic decline in major market indices."
During the four days following the World Trade Center attack, Knight incurred expenses of approximately $0.02 per share that could not be offset by trading revenue due to the market's closure. Losses from international expansion efforts were $10.6 million, equivalent to $0.09 per share.

Defendant Pasternak further commented on the Company's performance, and foreseeable future

performance, stating the following:

> Knight is adjusting to a new era that began in early 2001. When capital market
> activities came to an unexpected halt and growth and technology stocks fell out of
> favor, Knight started to right-size its business to reflect the suddenly stagnant market.
> These efforts continued through the third quarter, and today, we continue to review
> all aspects of our business, including real estate holdings, expenses and headcount.
> Our European operations are being scaled back to better reflect the current market
> environment. While Knight is adjusting to these new market realities, we also are
> carefully planning for the future by maintaining and even growing our competitive
> positions. The scale, capacity and technology that made Knight a low-cost trade
> execution destination for broker-dealers are increasingly attractive to institutional
> investors in a market with new dynamics. Meanwhile, we are seeing consolidation
> and abdication among market participants in the U.S. as the one-penny MPV and
> decline in depth-of-book further commoditize the equities trading business. *We
> continue to modify our trading algorithms to better price the liquidity we provide
> and to improve revenue capture per trade.*

> Knight will remain focused on our objectives to protect our strong balance sheet,
> manage the Company for profitability, and maintain or increase our competitive
> position in equities, derivatives and asset management. While we expect to be a
> beneficiary of market consolidation, we will balance business opportunities with
> challenging business conditions, keeping efforts to increase our competitive position
> in proportion with our profitability objectives.

48.    The statements contained in the Oct. 17, 2001 release, reproduced above in ¶ 47,

*supra*, were materially false and misleading and were know by defendants to be false at the time of

such publication, or were recklessly or negligently disregarded thereby, for the reasons stated herein.

### THE FRAUDULENT & ABUSIVE TRADE EXECUTION SCHEME
### IS BELATEDLY DISCOVERED & THE NASD INVESTIGATION
### INTO THE COMPANY IS BELATEDLY DISCLOSED

49.    On Dec. 18, 2001, defendants announced that Pasternak was retiring as Chairman and

CEO, effective Jan. 31, 2002. At this time, defendants stated that defendant Pasternak would

continue to serve as a director of the Company, until his term expires at Knight's annual meeting in

May 2002. Defendants also stated that Pasternak would continue to be paid by Knight purportedly

in exchange for "consulting" services at least until July 8, 2002. As defendant Pasternak abandoned

the Company, the Board made no disclosure concerning defendants' sponsorship of the Knight

brokers illegal trading practices and market manipulation. Moreover, while the Board's willingness

to continue to pay Pasternick for his "services" amounted to a ratification of his prior illegal conduct,

Pasternak's departure at this time was akin to a rat fleeing a sinking ship.

50.     Within weeks of defendant Pasternak's announcement of his sudden and unexpected

pending departure, on Jan. 7, 2002, NASD Regulation, Inc. (the "NASD Regulation") announced

that Knight Securities, L.P. had been censured to the tune of $1.5 million - - fined $700,000 and

directed to pay $800,000 to clients of the firm. *These sanctions were imposed for wide-ranging

market making and trading violations, including defendants' failure to assure that Knight

Brokers  honored posted quotes and accurately reported trades to the NASD*. As part of the

settlement with NASD Regulation, defendants neither admitted nor denied liability.

51.     While defendants made no admissions in connection with the NASD settlement, at

this time defendants already knew that Robert. S. Stellato ("Stellato"), Knight's former Global Head

of Institutional Sales, had reported the Company's front-running to the NASD during the prior year.

Defendants were well aware that Stellato had filed an arbitration complaint with the NASD, that

detailed the front-running scheme adopted by Company traders. Moreover, when defendants filed

Knight's Form 10-K for the year ended Dec. 31, 2001, with the SEC on Mar. 28, 2002, *any mention

of the Stellato arbitration and complaint were conspicuously absent*. These disclosures were also

absent in the Company's  amended 2001 Form 10-K, filed with the SEC on  Apr. 3, 2002 and in

Knight's Form 10-Q, filed with the SEC on May 15, 2002. Defendants purposefully, recklessly or

negligently disregarded that the failure to disclose Stellato's complaint and the NASD investigation

in Knight's above-mentioned SEC filings — despite boilerplate language in each of those documents

which discusses the possibility of such complaints or investigations — were false and misleading

to investors.

52.     On Apr. 4, 2002, in an effort to support the price of Company stock battered down

as a direct result of defendants illegal actions, the Knight Board approved the repurchase of up to $35

million of Company common stock. Rather than admit the true reason for the timing and amount of

this large stock repurchase, defendant Sanfilippo on behalf of the Board stated that the Board's

decision *"underscores our confidence in the Knight business model."*    Soon thereafter, when

announcing dismal results for 1Q:02, on Apr. 17, 2002,  the period ended Mar. 31, 2002, defendants

disclosed a 194% decline in net compared to the previous quarter. At this time defendant Sanfilippo

again highlighted the success of the Company's business model, in part, as follows:

- 20 -

*Regardless of the dynamic nature of the marketplace, we are confident in Knight's core business model. Our trading methodologies, scale, technology and human capital have made Knight the market leader, and we believe we understand our space better than any of our competitors.* We are still adjusting the business for survival in the near term, but we are also reinventing our Company for long-term success. Knight's domestic equities business was profitable in the first quarter and we enjoy significant market share. However, we want to be an impact player in every space in which we exist, not just in domestic equities, with an eye toward appropriate return for each business line. Knight's excellent financial health, with a strong cash position and no debt, gives us flexibility to make important but prudent investments in our future. *Our primary goal is to be the low-cost provider and one-stop execution venue for institutions and broker-dealers.*

53.    On June 3, 2002, the final day of the relevant period, for the first time defendants disclosed that, as a result of the stock-trading and market manipulation scheme which was widespread within the brokerage department at the Company and, as a result of the illegal actions engaged in and/or ratified by the Board's action or inaction, *the Company had now become the target of parallel investigations by the SEC and NASD*. The disclosure of these investigations for trading rule violations, the heart of the Company's business, had a devastating effect on the price of Knight's shares, which immediately plunged over 28% in the single trading session following this disclosure.

54.    The decline in the value of Knight common stock caused as a direct result of the belated disclosure of defendants illegal execution practices and improper market manipulation and usurpation of confidential customer information. Knight stock, which had traded above $60.00 per share during this time, now trades below $4.00 per share.

55.    During the relevant period, defendants materially misled the investing public, thereby inflating the price of Knight's common stock, by publicly issuing and/or causing the Company to issue false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

56.    Throughout the relevant period the market for Knight's securities was open, well-developed and efficient at all times. As a result of defendants' materially false and misleading statements and failures to disclose, Knight's common stock traded at artificially inflated prices during

the relevant period. Plaintiff and other shareholders of the Company purchased or otherwise acquired Knight securities relying upon the integrity of the market price of Knight's securities and market information relating to Knight, and have been damaged thereby. As a direct result of this damage, the Company has also been named as a defendant in a series of class action law suits filed and consolidated in this District. The illegality and impropriety of defendants actions during the relevant period will make these actions difficult if not impossible to defend and will cost the Company tens if not hundreds of millions of dollars to litigate, satisfy and/or resolve.

### The Knight Board Has Breached The Fiduciary Duties
### It Owed to the Shareholders of the Company

57. The Company's directors violated all notions of good faith and fair dealing for the following reasons:

(a) that, defendants created the materially false and misleading impression that Knight was able to fairy and efficiently manage customers orders and to provide such customers an efficient market in which to trade, when in fact the markets provided by defendants were neither fair nor efficient and were, at all times during the relevant period, manipulated by Knight traders who were actively front-running Knight customers' orders;

(b) that, the "record" trading volume which defendants announced could not be sustained as a direct result of defendants illegal trading activities. Since Company brokers were actively engaged in reducing the returns on Knight customers' transactions, it was only a matter of time before the impact of this illegal activity would reduce customer liquidity and/or customer confidence in the markets, such that Knight customers would necessarily be forced to trade less than they would otherwise have done;

(c) that, the "record" trading volume which defendants announced was artificially inflated, in part, by the front running trades enacted by Knight Brokers themselves - - the more front running the greater the trading volume, the bigger rip-off of customers the higher the brokers' illegal profits;

(d) that, defendants were aware at least from the beginning of 2001 that Robert

- 22 -

S. Stellato, Knight's former Global Head of Institutional Sales, had reported the Company's front-running to the NASD and that defendants had failed to disclose this material fact when defendants caused Knight to file with the SEC its Form 10-K for the year ended Dec. 31, 2001, its amended 2001 Form 10-K, filed with the SEC on Apr. 3, 2002 and in Knight's Form 10-Q, filed with the SEC on May 15, 2002.

        (e)    that, defendants had purposefully, recklessly or negligently included boilerplate language in each of the documents defendants caused Knight to file with the SEC, which discussed the possibility of such complaints or investigations — yet consistently disregarded and failed to disclose Stellato's complaint and the NASD investigation in Knight;

        (f)    that, it was a breach of fiduciary duty to continuously fail to disclose that the artificial inflation of the Company's revenues and earnings by defendants was masking the fact that Knight was not performing according to expectations sponsored by defendants; and

        (g)    that, it was a breach of fiduciary duty for the Knight Board to fail to prevent defendants from issuing false and materially misleading statements and financial reports about Knight, and it was a further breach of duty by the Board to fail to take any action against the officers and/or directors directly responsible for the illegal actions complained of herein.

### The Knight Board Is Not Disinterested or Independent and Could Not Fairly Evaluate Any Demand By Plaintiff And Therefore Any Demand By Plaintiff Is Excused

    58.    Plaintiff brings this action derivatively, pursuant to the New Jersey Business Corporations Act, in the right and for the benefit of Knight to redress injuries suffered and to be suffered by Knight and its shareholders as a direct result of the violations of law and breaches of fiduciary duty and corporate waste by defendants. Knight is named as a nominal defendant in this derivative action solely in a derivative capacity. However, since nominal defendant Knight is a corporation organized under the laws of Delaware, and since Delaware does not require plaintiff to make a demand on the board of directors prior to initiating such action if said demand is or would be futile, as is the case here, no such demand on the Knight Board has been made and no such demand for action is required.

59.     Plaintiff will adequately and fairly represent the interests of Knight in enforcing and prosecuting its rights, and has obtained counsel experienced, competent and practiced in prosecuting derivative actions.

60.     In addition to their dominance and control over Knight as a result of their stock ownership and/or membership on the Board of Directors of the Company, defendants also have long-standing personal and professional entanglements and relationships with other Board members and/or realize significant benefits as a result of related-party business they conduct with Knight or one-another, and this has prevented them and is continuing to preventing them from acting independently to fulfill the fiduciary duties owed to Knight and its shareholders and from taking the action requested herein. Moreover, as a result of these conflicts of interest defendants can not and will not be able to independently consider any demand by plaintiff in a disinterested manner to take the action requested herein.

61.     The entire Knight Board of Directors and senior management participated in the wrongs complained of herein and/or is controlled by those who have. Knight's directors and senior management are not disinterested or independent. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Knight in that they failed to ensure that the Company did not engage in fraudulent and/or deceptive or misleading practices which had the effect of materially misleading investors as to the true financial and operational position of Knight.

62.     In addition to the foregoing, as stated herein *supra*, as of the filing of this Complaint, several class action law suits have been filed against the Company alleging violations of the federal security laws relating to essentially the same activity complained of herein. Thus, the actions of the Knight Board have severely harmed Knight and subjected Knight to tens and possibly hundreds of millions of dollars in liability for possible violations of applicable securities laws and millions in additional personal liability to Knight and its shareholders.

63.     Moreover, to fully remedy the wrongs against Knight, the Company needs to file an action for immediate injunctive relief against the individuals comprising the Board for breaching the

- 24 -

fiduciary duties they owe to Knight and its shareholders. Even though the Board is charged with having ultimate responsibility for the management and control of the Company, the members of the Knight Board have violated the trust, care and fidelity placed upon them by applicable law. The members of Knight's Board of Directors have demonstrated their unwillingness to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for failure to do so. These people are of course the same people who have developed professional relationships with, who are their friends and with whom they have entangling alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

64.     Knight's senior insiders have shown their interests are antagonistic to this lawsuit. The directors have also refused to take immediate action, as authorizing a suit against themselves would require the directors to expose themselves to a huge multi-million dollar liability to the Company, which, due to the particular language of currently utilized directors' and officers' liability insurance policies (i.e., the insured vs. insured exclusion), would not be an insured claim, while the claims asserted via this derivative action are insured.

65.     Defendants are not acting in good faith or in the best interests of Knight or its shareholders and have breached and are continuing to breach their fiduciary duties to Knight and its shareholders.

66.     The underlying misconduct of defendants is not a product of a valid exercise of business judgment, and can not be properly ratified by the Board.

**BASIS OF ALLEGATIONS**

67.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission filings by Knight, as well as regulatory filings and reports, securities  analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM FOR RELIEF

### Against All Defendants for Breach of Fiduciary
### Duties of Loyalty and Due Care

68.    Plaintiff incorporates herein by reference ¶¶1-67, inclusive.

69.    Defendants deliberately engaged in conduct in breach of their fiduciary duties to
Knight, including, among other things: (i) by creating the materially false and misleading impression
that Knight was able to fairy and efficiently manage customers orders and to provide such customers
an efficient market in which to trade, when in fact the markets provided by defendants were neither
fair nor efficient and were, at all times during the relevant period, manipulated by Knight traders who
were actively front-running Knight customers' orders; (ii) the "record" trading volume which
defendants announced could not be sustained as a direct result of defendants illegal trading activities;
(iii) defendants artificially inflated the Company's purported "record" trading volume, in part, by the
front running trades enacted by Knight Brokers themselves; and (iv) defendants failed to disclose that
they were on actual notice, at least from the beginning of 2001, that Knight's former Global Head of
Institutional Sales had reported the Company's front-running to the NASD; and (v) it was a breach
of fiduciary duty for the Knight Board to fail to prevent defendants from issuing false and materially
misleading statements and financial reports about Knight, and it was a further breach of duty by the
Knight Board to fail to take any action against the officers and/or directors directly responsible for
the illegal actions complained of herein.

70.    By reason of the foregoing, plaintiff as a shareholder and representative of Knight
seeks relief for Knight, which has sustained and will continue to sustain irreparable harm and has no
adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Against All Defendants for Waste of Corporate Assets

71.    Plaintiff incorporates herein by reference ¶¶1-70, inclusive.

72.    As a result of defendants' actions as alleged herein, defendants have forced and/or
allowed Knight to waste millions of dollars of Knight's capital by, among other things: (i) allowing
Company brokers to usurp  (i) by creating the materially false and misleading impression that Knight

- 26 -

was able to fairy and efficiently manage customers orders and to provide such customers an efficient market in which to trade, when in fact the markets provided by defendants were neither fair nor efficient and were, at all times during the relevant period, manipulated by Knight traders who were actively front-running Knight customers' orders; (ii) the "record" trading volume which defendants announced could not be sustained as a direct result of defendants illegal trading activities; (iii) defendants artificially inflated the Company's purported "record" trading volume, in part, by the front running trades enacted by Knight Brokers themselves; and (iv) defendants failed to disclose that they were on actual notice, at least from the beginning of 2001, that Knight's former Global Head of Institutional Sales had reported the Company's front-running to the NASD; and (v) it was a breach of fiduciary duty for the Knight Board to fail to prevent defendants from issuing false and materially misleading statements and financial reports about Knight, and it was a further breach of duty by the Knight Board to fail to take any action against the officers and/or directors directly responsible for the illegal actions complained of herein.

73.    By reason of the foregoing plaintiff, a shareholder and representative of Knight, has sustained and will continue to sustain irreparable harm for which there is no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands judgment, including preliminary and permanent injunctive relief, in favor of Knight and against all defendants, and each of them, as follows:

(A)    Declaring that all defendants, and each of them, have breached and are breaching their fiduciary and other duties to Knight and its public shareholders;

(B)    Granting compensatory damages against defendants in favor of Knight;

(C)    Awarding plaintiff's costs and disbursements and plaintiff's attorneys' fees; and;

(D)    Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

DATED: September 23, 2002

SHEPHERD & FINKELMAN LLC

_____
James C. Shah)
Washington Professional Campus
900 Route 168, Suite B4
Turnersville, NJ  08012
858/232-7900
856/232-7502 (fax)

SCOTT & SCOTT, LLC
DAVID R. SCOTT
JAMES E. MILLER
108 Norwich Avenue
Colchester, CT  06415
860/537-3818

Attorneys for Plaintiff

# VERIFICATION

I, the undersigned, say:

I am one of the plaintiffs in the above-entitled action; I have read the foregoing COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND CORPORATE WASTE and know the contents thereof; and I certify that the same is true of my own knowledge, except as to those matters which are therein stated upon my information or belief, and as to those matters I believe it to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _13_ day of September, 2002 at _Palmetto, Florida._

JOSEPH T. CHABAK